# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.   20-260 |
| SHAQUAN BROWN | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, Anthony J. Carissimi and J. Jeanette Kang, Assistant United States Attorneys for the District, and Brian Doherty, Special Assistant United States Attorney, hereby files this memorandum in advance of the sentencing hearing in this case, which is scheduled for November 20, 2025.

The defendant is responsible for an extraordinarily violent robbery in which he and his codefendants beat, ziptied, and terrorized a family, including a three-year-old child. While this Court has certainly seen violent cases before, this case is different. The defendant's conduct was premeditated, calculated, and cruel in ways not seen in other cases. The sentencing guidelines do not accurately capture the impact that this defendant had on the families he targeted, nor do they accurately capture the harm he caused by targeting children. And the defendant did not stop by victimizing the owners of Fiji Nail Salon and their family—just days later he once again armed himself with a loaded handgun and attempted to commit another home invasion at a home owned by another business owner after planning that crime in painstaking detail.

Based on these criminal acts, the government respectfully asks for an upward variance and for this Court to impose a significant term of incarceration. An upward variance is warranted based on the nature and circumstances of the offenses, and the defendant's history and

1

characteristics. It is also necessary to help ensure that this defendant will not continue to victimize other families.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.  **BACKGROUND**

On February 3, 2022, a grand jury sitting in this District returned a ten count superseding indictment charging the defendant with conspiracy to commit robbery which interferes with interstate commerce, in violation of 18 U.S.C. § 1951 (Count One); robbery which interferes with interstate commerce, and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2 (Counts Two and Six); attempted robbery which interferes with interstate commerce, and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count Four); and using, carrying and brandishing a firearm during and in relation to a crime of violence, and aiding and abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Counts Three, Five, and Seven); and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), all arising from the defendant's conspiracy to commit, and participation in, two armed robberies of business owners and one attempted armed robbery of a suspected drug dealer.[1]

Following a trial, on April 22, 2024, a jury convicted the defendant of Counts One, Six, Seven, and Eight. He was acquitted of Counts Two, Three, and Four.

### a.  *The Conspiracy*

The defendant was released from serving a prison sentence for drug dealing on October 28, 2019, and immediately set about organizing a conspiracy to commit home invasion robberies in the Eastern District of Pennsylvania. Evidence introduced at trial showed that the defendant armed himself with a handgun with an obliterated serial number, purchased a GPS tracker and other tools of his trade, and communicated with his coconspirators Willie Singletary, Tyreek

---

[1] On February 8, 2023, the government moved to dismiss Counts 5 and 7 of the Second Superseding indictment following the Supreme Court's decision in *United States. v. Taylor*, 596 U.S. 845 (2022), which held that attempted Hobbs Act robbery is not a "crime of violence" as defined in 18 U.S.C. 924(c)(3)(A).

Byrd, and Sahir McCorkle. The defendant identified targets to rob, tracked their movements, and relayed information about their patterns of life to his cohorts. He was methodical, calculating, and cruel. The defendant initiated these preparations despite being on court-ordered supervision and awaiting resentencing in his drug dealing cases.

      b.  *The Fiji Nails & Spa Robbery*

On December 31, 2019, the defendant, Byrd, and McCorkle robbed the Fiji Nails & Spa Salon in Havertown, Pennsylvania. Prior to the robbery, the defendant had placed a GPS tracking device on victim T.D.'s car to obtain information about his habits and routine. He had also surveilled T.D.'s home. On the night of the robbery, the defendant, McCorkle, and Byrd drove to the Fiji Nails & Spa armed with firearms, zip ties, and duct tape. Upon their arrival, the group waited for T.D. to park his car and confronted him at the rear entrance of the Fiji Nails & Spa. They forced T.D. inside at gunpoint and restrained him with duct tape and zip ties. The coconspirators ransacked the first floor of the business, stole business proceeds, and then forced T.D. to the upstairs residence at gunpoint where T.D.'s wife, K.N., was present with their five children—aged 3 months, 3 years, 6 years, 8, years, and 10 years—and their elderly nanny. The defendant, Byrd, and McCorkle then restrained all the victims in one of the bedrooms, threatened them, and beat them in order to obtain business proceeds. When the family insisted that they did not have money, they defendant and his coconspirator led T.D. downstairs at gunpoint while swinging his three year-old daughter by her neck. The men stole an additional $10,000 from the ATM and fled in the defendant's car. The Fiji Nails and Spa Salon was a business engaged in interstate commerce.

### c. The Attempted Robbery in Uwchlan Township

At approximately 10:30 a.m. on January 3, 2020 (four days after the robbery of Fiji Nails & Spa), Uwchlan Township Police Department ("UTPD") officers responded to a radio call for a residential burglary in progress at Dowlin Forge Lane in Downingtown, Pennsylvania (which is located in Uwchlan Township). The owner of the residence was alerted via a home security system application on her smart phone that motion was detected at the residence, which was unoccupied at the time. The owner was able to see two black males in dark clothing attempting to pry open a window at the residence.

Law enforcement officers responded almost immediately. When officers arrived, they saw the defendant and another man attempting to open a window at the home. The defendant wore white gloves and had a black backpack on his back. Upon seeing the officers, the two men fled on foot into woods surrounding the residence. As he fled, Brown dropped a firearm on the property of the residence and then picked it up. Brown then fled into the woods where officers briefly lost sight of him. Minutes later, officers saw Brown running through a creek and into a tunnel underneath a small bridge adjacent to the property where he fled. They resumed pursuit and continued chasing Brown through the creek, eventually catching him while still in the water. The officer who stopped Brown was wearing a body-worn camera, and the arrest was captured on video. The body-worn camera video shows that when the defendant was arrested, he attempted to destroy his cell phone by dunking it in the in the creek. The second perpetrator was not located. However, when officers traced the flight path of the second individual, they recovered an unserialized Polymer 80 firearm and burglary tools.

At the time of his arrest, Brown was wearing a black North Face backpack, a pair of eyeglasses, a black Nike hooded sweatshirt, and a "joker" style face mask around his neck. This precisely matched the clothing he wore during the Fiji robbery days earlier. Officers searched

Brown's backpack and recovered a chrome and black Smith & Wesson, .40 caliber pistol with an obliterated serial number, loaded with 10 rounds of ammunition and 1 round in the chamber, as well as black zip ties and duct tape. These were tools of the defendant's trade and prove that he was willing to commit violence on the day he was arrested. Additionally, police recovered the "joker" face mask from Brown after discovering through interior police vehicle video surveillance that he had removed it from his neck and concealed it in the patrol vehicle immediately following his arrest.

Following Brown's arrest, police officers located a 2010 black Chevrolet Impala, bearing Pennsylvania registration LFP7559, in close proximity to the residence of the attempted burglary. The Impala was retained as evidence and a search warrant was obtained by UTPD detectives. Recovered from the Impala were, among other items, a pair of men's size 8 boots, mirrors on an extended pole, magnetic poles, and a battery powered LED light.

## II.    SENTENCING CALCULATION

### A.  Statutory Maximum Sentence

The statutory maximum penalty on each of Counts One, Six, and Eight (conspiracy to commit robbery which interferes with interstate commerce, robbery and attempted robbery which interferes with interstate commerce) is 20 years' imprisonment, a $250,000 fine, a 3-year period of supervised release, and a $100 special assessment.

The statutory maximum penalty on Count Seven (using, carrying and brandishing a firearm during and in relation to a crime of violence, and aiding and abetting) is lifetime imprisonment, a 7-year mandatory minimum term of imprisonment consecutive to any other sentence of imprisonment imposed, a 5-year period of supervised release, a $250,000 fine, and a $100 special assessment.

The statutory maximum penalty on Count 10 is 10 years' imprisonment, a 5-year period

of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum and Mandatory Minimum Sentence: lifetime imprisonment, a mandatory minimum 7 years' imprisonment consecutive to any other sentence of imprisonment imposed, a 5-year period of supervised release, a $1,250,000 fine, and a $500 special assessment.

**B. Sentencing Guidelines Calculation**

The U.S. Probation Office has calculated the applicable Sentencing Guidelines as follows

| Group I – Conspiracy to Commit Robbery & the Robbery of Fiji Nails PSR ¶¶ 36-43 | |
|---|---|
| USSG Section | Offense level |
| Base offense level, § 2B3.1(a) | 20 |
| Victims sustained bodily injury, § 2B3.1(b)(3)(A) | +2 |
| Victims were abducted to facilitate offense, § 2B3.1(b)(4)(A) | +4 |
| Vulnerable Victim Adjustment, § 3A1.1(b)(1) | +2 |
| Total offense level | 28 |
| **Group II – Attempted Robbery of A.H. & Possession of a Firearm by a Felon PSR ¶¶ 44-47** | |
| Base offense level, § 2K2.1(a)(2) | 24 |
| Firearm had an obliterated serial number, § 2K2.1(b)(4)(B)(i) | +4 |
| Firearm used in connection with an attempted robbery, § 2K2.1(b)(6)(B) | +4 |
| Total offense level | 32 |
| **Grouping/Multi Count Adjustments PSR ¶¶ 51-57** | |
| Greater of adjusted offense levels above | 32 |
| USSG § 3D1.4 – 2 units | +2 |
| **Total combined offense level** | **34** |

The probation office calculated the defendant's criminal history score as six resulting in a

criminal history category of III. PSR ¶ 65. As explained further below, the government believes

that his criminal history score is actually seven, and therefore his criminal history category is IV.

The probation officer calculated the applicable guideline range to be 188-235 months'

incarceration, plus an 84-month mandatory minimum term of incarceration.   Accordingly, the

probation officer's final guidelines calculation is 272 to 319 months' incarceration.

The government respectfully disagrees with this calculation and seeks the inclusion of six

additional levels. First, the probation office found that T.D. had suffered from "bodily injury"

and therefore applied a two-level enhancement under §2B3.1(b)(3)(A). Bodily injury is defined

as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which

medical attention would ordinarily be sought." USSG § 1B.1, Note 1(B). The government

objected and sought a four-point enhancement because T.D. suffered from serious bodily injury.

Serious bodily injury is defined as, *inter alia*, an injury "requiring medical intervention such as . .

. hospitalization." *Id.* Note 1(L).

Here, T.D. was violently pistol whipped in the face, causing him to receive a gash over

his lip which required stitches. A picture of the injury is shown below, which was taken while

T.D. was in the hospital and admitted during the trial as Government Exhibit 411. *See* Trial Tr.

4/9/2024, 149-51.



The probation office did not apply the "serious bodily injury" enhancement because it "differentiated between 'going to the hospital' and 'hospitalization.'" PSR, 30. But no such distinction is warranted. In a non-precedential opinion, the Third Circuit previously held that it was not plain error for a district court to apply the serious bodily injury enhancement when a victim was stabbed in the face multiple times and "was hospitalized (*albeit not admitted overnight*), and received medical intervention in the form of nine stitches." *United States v. Montalban*, 604 Fed. App'x 100, 104 (3d Cir. 2015) (non-precedential) (emphasis added). *Montalban* relied on *United States v. Corbin*, 972 F.2d 271, 272 (9th Cir. 1992) (per curiam), a case in which the serious bodily injury enhancement applied to a defendant at sentencing here he had struck a victim with a metal object and that required 25 stitches to heal. At least one other court in the Eastern District of Pennsylvania has found that the serious bodily injury enhancement was applicable where a victim required stitches to close a gash in her head sustained during a home invasion robbery. *See United States v. Caesar*, 2024 WL 3729857 *1, 3 (E.D.Pa August 8, 2024) (Surrick, J.) (finding that a defendant was ineligible for reduction in sentence because he had inflicted serious bodily injury on a victim "when she was bruised and

cut and was transported to the hospital and received staples and stitches to her head after the robbery").

Here, the injuries that the defendant caused to the victim warrant a four-level increase because they amounted to serious bodily injury. At trial, K.N. testified that the robbers "beat [T.D.] up really bad," they "punch[ed] him into the wall" and "smack[ed] him with the gun." Trial Tr. 4/9/2010; 160. T.D.'s wounds were so severe that they required him to go to the hospital and receive stitches. This is sufficient under the Sentencing Guidelines for a four-level enhancement.

Second, a two-level enhancement is warranted for the Fiji Nails and Spa robbery under USSG § 3B1.1(c), which provides for a 2-level increase when the defendant was "an organizer, leader, manager, or supervisor in any criminal activity" that gave rise to the offense of conviction. USSG § 3B1.1(c). This enhancement is appropriate here because the defendant acted as a leader in his criminal conspiracy and with respect to the Fiji Nails and Spa robbery.

"When a person manages or supervises another in the course of a criminal enterprise, the manager or supervisor will normally be more culpable than the person managed or supervised." *United States v. Fuentes,* 954 F.2d 151, 153 (3d Cir.1992). "The direction and control of others is a recurrent theme in legal definitions of the terms 'manager' and 'supervisor.'" *United States v. King,* 21 F.3d 1302, 1305 (3d Cir.1994). For this enhancement to apply, the "organizer" or "leader" must have "exercised some degree of control over others involved in the commission of the offense." *United States v. Scruggs,* 617 Fed. App'x 128, 133 (3d Cir. 2015) (quoting *United States v. Helbling,* 209 F.3d 226, 243 (3d Cir. 2000)). In *Scruggs,* the Third Circuit found that an enhancement was appropriate under USSG § 3B1.1(c) where the defendant recruited his codefendants for the robbery scheme, informed them of the inner workings of a McDonalds that the group robbed and the location of a safe within the restaurant, gave a signal to commence the

robbery, and drove the getaway car. *Id.*

Here, the defendant exercised a similar level of control over his coconspirators. Evidence introduced during the trial showed that the defendant selected targets for robberies. Trial Tr. 4/10/2024, 36. The defendant then informed coconspirator Sahir McCorkle that "he had somebody to rob" by communicating with text messages. *Id.* at 37. He provided the victims' addresses and instructed McCorkle about what to bring to the robberies, such as zip ties. *Id.* The defendant also provided the masks that were worn during the Fiji robbery. *Id.* at 80.

The evidence also showed that the defendant obtained information about the victims of both the Fiji robbery and the attempted robbery of A.H. by attaching a GPS tracker to their cars. *Id.* at 73, 95; Trial Tr. 4/11/2024, 128-30; Gov. Ex. 803, 809. He also conducted extensive research into his victims prior to committing the robberies with the group. Trial Tr. 4/11/2024, 174, 189.

In short, the robbery of Fiji Nails and Spa and the attempted robbery of A.H. would not have been possible without the defendant, because he was the leader of the group. He selected the victims or ensured that they were viable targets for a robbery. He placed GPS trackers on their cars and studied their patterns of life. He recruited his coconspirators. And he either provided them with the tools they needed to commit the robberies or informed them about what to bring. An additional two-points is therefore warranted under § 3B1.1(C). Accordingly, the government respectfully requests that the sentencing guidelines be calculated as follows:

| Group I – Conspiracy to Commit Robbery & the Robbery of Fiji Nails | |
|---|---|
| USSG Section | Offense level |
| Base offense level, § 2B3.1(a) | 20 |
| Victims sustained serious bodily injury, § 2B3.1(b)(3)(A) | +4 |

| Victims were abducted to facilitate offense, § 2B3.1(b)(4)(A) | +4 |
|---|---|
| Vulnerable Victim Adjustment, § 3A1.1(b)(1) | +2 |
| Organizer/Leader enhancement, § 3B1.1(c) | +2 |
| Total offense level | 32 |
| **Group II – Attempted Robbery of A.H. & Possession of a Firearm by a Felon** | |
| Base offense level, § 2K2.1(a)(2) | 24 |
| Firearm had an obliterated serial number, § 2K2.1(b)(4)(B)(i) | +4 |
| Firearm used in connection with an attempted robbery, § 2K2.1(b)(6)(B) | +4 |
| Total offense level | 32 |
| **Grouping/Multi Count Adjustments** | |
| Greater of adjusted offense levels above | 32 |
| USSG § 3D1.4 – 2 units | +2 |
| **Total combined offense level** | **34** |

The government also believes that one additional point should be added to the defendant's criminal history category.[2] The probation office correctly calculated the points attributable to the defendant's prior convictions as set forth in paragraphs 60 through 63. In paragraph 64, however, the probation office assigned zero points for a North Carolina conviction for providing false or fictitious information to a law enforcement officer for which the defendant received a sentence of thirty days imprisonment. PSR ¶ 64. The probation officer cited USSG § 4A1.2(c)(1) as the basis for assigning the conviction zero points. However, that provision states that sentences for providing false information to a police officer are counted if, *inter alia*, the

---

[2] Regrettably, the government did not identify this argument in its initial objections to the PSR and therefore did not raise it with the probation officer until drafting this memorandum. Undersigned counsel spoke with the probation officer who prepared the report, who advised that there are no supporting documents for this conviction, but the sentence is reflected on the defendant's NCIC report.

defendant received a sentence of "a term of imprisonment of at least thirty days." USSG § 4A1.2(c)(1)(A). The defendant's thirty-day sentence should therefore count under this guideline provision, and he should receive an additional point added to his criminal history score.

Consequently, the defendant's actual criminal history score should be 7, placing him in criminal history category IV. The government respectfully requests that this Court calculate the guidelines as follows: the defendant's criminal history category IV and offense level of 34 yields a guidelines range of 210-268 months. An additional 84 months are added for the § 924(c) conviction, bringing the total guidelines range to 294-352 months.[3]

## III.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

---

[3] The defendant has raised several objections to the guidelines calculation. The government agrees with the responses provided by the probation officer to those objections.

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**A.  The nature and circumstances of the offenses.**

The defendant and his coconspirators mercilessly beat, tied up, and stole from a hardworking family in our District who were living their lives and doing their jobs. His tactics involved particular cruelty—the defendant and his coconspirators bound children together with zip ties, threatened to drown a three-year-old girl, beat the male business owner until he was bleeding, and threw him through a wall. He targeted another family for a home invasion robbery which was thwarted when he was captured on camera trying to break into the house and police arrested him. The defendant carried a loaded .40 caliber firearm with an obliterated serial number in order to effectuate these crimes.

The impact of this crime on the victims cannot be overstated. The defendant traumatized his victims. He ransacked their homes. He left them bloody, bruised, and terrified. The defendant must be sentenced to a lengthy term of incarceration that will account for the egregious nature of his violent robbery offenses.

These were not crimes of opportunity, nor were they crimes of desperation. The level of preparation that the defendant put into stalking his prey is truly chilling. The defendant researched their businesses and home addresses, placed trackers on their cars, and stalked their movements. The defendant's singular focus on victimizing families provides keen insight into

his state of mind, his lack of morals, and his dangerousness. This Court's sentence must reflect that.

Furthermore, an upward variance is appropriate because the defendant's guidelines do not capture the full extent of his conduct. Although the vulnerable victim enhancement applies here, it does not account for the *four* children that the defendant and his coconspirators ziptied together during the course of the robbery. *See* Trial Tr. 4/10/2024, 83, 85, 87. The children had front-row seats to the violence that this defendant inflicted on the victims. In fact, one child heard the defendant and his cohorts demanding money so frequently that the boy offered the defendant a dollar that he received from the tooth fairy so that they violence would stop. Trial Tr. 4/9/2024, 161. This extraordinarily depraved conduct is not encompassed by any guidelines' enhancement and warrants an upward variance. PSR ¶ 119.

### B. History and characteristics of the defendant.

The defendant is now 31 years old. He largely declined to provide details of his upbringing to the probation officer. *See* PSR ¶¶ 76-77. Instead, he provided details about his childhood to the court appointed "mitigation specialist," stating that he suffered from abuse and neglect while living with his mother in North Carolina. Notably, this differs from what he told the probation officer about his experience with his mother, PSR ¶ 78, where he claimed he was provided for within the home. Further, the defendant asserted that he had a good relationship with his father until he was "betrayed" by him when his father identified him at trial as one of the people who robbed the Fiji Nails and Spa salon.

The Court should consider the defendant's criminal history when determining his sentence. The defendant was first arrested as an adult for selling drugs and carrying a firearm on July 2, 2014. PSR ¶ 60. Undeterred by the arrest, the defendant was arrested just twelve days later for burglary. PSR ¶ 61. In December 2014, he was again arrested for possessing drug

paraphernalia. PSR ¶ 62. Three months later, the defendant was again arrested for selling drugs. PSR ¶ 63. The defendant received a 1-2 year sentence for the burglary conviction, and an aggregate sentence of 5-10 years' confinement followed by 10 years' probation on the drug dealing and firearms offenses. His time in custody was marked by myriad infractions. While in state custody, he incurred 12 misconducts, including possession of contraband and fighting.[4]

The defendant was released from custody on October 28, 2019 and almost immediately resumed his criminal activity. Less than three weeks after his release from custody, on November 14, 2019, the defendant took a photograph of himself armed with the .40 caliber handgun that he used in the current crimes.



Eleven days later, on November 26, 2019—less than a month after the defendant had

---

[4] This pattern of conduct has continued while incarcerated at FDC Philadelphia. The defendant has incurred six infractions, including 4 infractions for fighting. Even while incarcerated, the defendant has still continued his violence.

been released from custody—the defendant gleefully texted Byrd that he was purchasing a GPS

tracker, and that "we on."



In other words, the defendant resumed committing crimes as soon as he was able, and the

brazenness of this conduct and the timing cannot be overstated. The defendant had just been

released from prison, had recently pleaded guilty to two drug-dealing and firearms offenses, and

was under court ordered supervision. He nevertheless immediately armed himself with a firearm

and launched himself fully into a criminal conspiracy to track victims for home invasion

robberies.

The defendant's actions speak louder than his words—including the words that underlie

the mitigation report that he has prepared. The defendant was not a victim of circumstance, nor

did he suffer from impulse control as a result of developing brain. The defendant sought out his

victims and hunted them with dogged tenacity. He had no problem employing violence on the

most vulnerable populations—whether they were three years old or septuagenarians. He methodically prepared to commit his crimes and followed through, employing horrific violence along the way and demonstrating a willingness to commit more if necessary. That is who the defendant is and this Court's sentence should reflect that reality.

### C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

As stated above, the defendant was involved in committing serious offenses. Armed robberies offenses have ravaged this District. The community lives in fear that their next day at work could be their last. This defendant has directly contributed to this problem. The damage that this defendant has done to his victims, and this community, is immeasurable. The Court should embrace the need to protect the public from the defendant. A significant term of incarceration would provide just punishment and promote these sentencing objectives.

### D. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

The government urges to consider the importance of specific deterrence and incapacitation in this particular case. The defendant has demonstrated that he will not stop committing crimes that harm people. The defendant must be incapacitated to protect society. The defendant must also be sentenced to a substantial term of incarceration to ensure that the defendant never commits crimes like this again.

The sentence the Court imposes should also provide general deterrence to criminal conduct. This case itself is a proper vehicle to demonstrate a need to deter the public from committing these types of crimes. A significant sentence will not only serve as a deterrent, but will also effectively incapacitate the defendant and prevent him from committing further crimes in society.

**D.    The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no known need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). A sentence of incarceration will afford him ample opportunity to further his training, education, care or treatment, should he desire to, through the various educational opportunities provided to inmates within the Bureau of Prisons.

**E.    The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

While the Sentencing Guidelines are advisory, they remain the sole means available of assuring some measure of uniformity in sentencing. Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments.

The defendant's coconspirator, Willie Singletary, received a 17-year sentence from his Court for his participation in this conspiracy. His other coconspirator, who testified at trial, received a 15-year sentence. The defendant is deserving of a far greater sentence.

**E.    The need to provide restitution to any victim of the offense.**

The law requires that the defendant pay restitution to his victim. 18 U.S.C. § 3663A. This Court should order full restitution for the victims in this case.

## IV.   <u>CONCLUSION</u>

The government's recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Anthony J. Carissimi*
ANTHONY J. CARISSIMI
Assistant United States Attorney
J. JEANETTE KANG
Assistant United States Attorney
BRIAN DOHERTY
Special Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the Government's Sentencing Memorandum has

been served upon the below attorney via e-mail:

Leigh Skipper, Esquire
*Counsel for Shaquan Brown*


<u>*/s/ Anthony J. Carissimi*</u>
ANTHONY J. CARISSIMI
Assistant United States Attorney


Date: November 14, 2025